IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Corey Glover, | C/A No.: |
| Plaintiff, | |
| v. | COMPLAINT<br>**Jury Trial Requested** |
| The Boeing Company, | |
| Defendant. | |

Plaintiff Corey Glover (hereinafter, "Plaintiff"), by and through his undersigned counsel, hereby brings forth the following claims against Defendant, The Boeing Company. Plaintiff asserts Causes of Action for Race Discrimination, Retaliation, and the creation and maintenance of a Racially Hostile Work Environment, all in violation of 42 U.S.C. § 1981. Additionally, Plaintiff brings claims for Breach of Contract and Breach of Contract Accompanied by Fraudulent Intent. These claims arise from the factual and legal grounds set forth herein, which collectively demonstrate Defendant's unlawful, discriminatory, and improper conduct toward Plaintiff, contributing to a hostile and intolerable work environment based on race.

## ADMINISTRATIVE CHARGE

1. Plaintiff has pursued available administrative remedies through the South Carolina Human Affairs Commission; however, this action proceeds independently under 42 U.S.C. § 1981 and applicable state law, which do not require administrative exhaustion as a prerequisite to suit.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically 42 U.S.C. § 1981,

which prohibits race discrimination, retaliation, and the creation and maintenance of a racially hostile work environment.

3. This Court has supplemental jurisdiction over Plaintiff's related state law claims, including Breach of Contract and Breach of Contract Accompanied by Fraudulent Intent, pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in the District of South Carolina, Charleston Division, pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred within this District and Division, and Defendant regularly conducts business within this jurisdiction.

## PARTIES

5. Plaintiff is an African American male and a citizen of the United States. Plaintiff resides in Berkeley County, South Carolina, within this Judicial District.

6. Defendant, The Boeing Company (hereinafter, "Defendant"), is a Delaware corporation authorized to conduct business in the State of South Carolina. Defendant maintains substantial business operations, including manufacturing and production facilities, within this Judicial District. At all times relevant to this action, Defendant employed Plaintiff and was responsible for the policies, practices, procedures, acts, and omissions alleged herein.

## FACTS

7. Plaintiff is a 47-year-old African American male who was employed by Defendant for approximately sixteen (16) years. Plaintiff began his employment in or around February 2009 as a mechanic and remained employed until his involuntary termination via layoff on or about November 13, 2024.

8. Plaintiff entered into employment with Defendant based on express and implied terms set forth in Defendant's policies, Code of Conduct, and Ethical Business Conduct Guidelines, which formed part of the employment contract. These terms included representations that the workplace would be fair, respectful, and free from discrimination, harassment, and retaliation, and that compensation and advancement would be based on merit and performance. Defendant also represented that employees would have access to internal grievance and alternative dispute resolution procedures to address any concerns in good faith. Plaintiff reasonably relied on these contractual representations in accepting and continuing his employment. These commitments were material inducements to the employment relationship and constituted binding terms of the contract between Plaintiff and Defendant.

9. Throughout his tenure, Plaintiff consistently demonstrated commitment, initiative, and performance, progressing into roles of increasing responsibility, taking part in job-related trainings, obtaining various occupational certifications, and maintaining all required credentials. Plaintiff received numerous accolades, including over fifteen (15) Boeing Pride Awards, awarded to employees that go above and beyond their job responsibilities.

10. In 2021, Plaintiff's then-manager, Mr. Josh Owens (Caucasian Male), selected him to participate in a six-to-nine-month Standard Kit Optimization (SKO) project focused on reducing company waste. The selection underscored Defendant's recognition of Plaintiff's technical expertise, reliability, and leadership potential.

11. Further, in 2021, Plaintiff also took the initiative to schedule one-on-one job shadowing sessions with various supervisors at Defendant to further develop his skills and career trajectory. Additionally, Plaintiff proactively sought mentorship from Ms. Brenda Chapman (African American Female), who served as a hiring manager for Defendant.

12. However, during Plaintiff's mentorship, Ms. Chapman conveyed a racially charged remark, informing Plaintiff that, based on her discussions with other staff at Defendant, he was perceived by his Caucasian colleagues as "intimidating" due to his appearance. Ms. Chapman did not present this as her own view, but rather as a reflection of the sentiments expressed by others. Subsequently, Plaintiff was instructed to lower his chair during meetings and to avoid making eye contact with others—directives rooted in harmful racial stereotypes and seemingly intended to minimize this perceived intimidation.

13. In May 2022, Plaintiff was promoted to a Line Side Control Center (LSCC) position within Defendant and was later encouraged by peers and supervisors to apply for a Workplace Coach position. Plaintiff obtained multiple additional job-specific certifications during this period and continued to be recognized for his leadership and performance.

14. In late 2022, Plaintiff applied for Defendant's internally posted Workplace Coach position, which was explicitly classified as a Level 3 role, with a corresponding salary range reflective of that classification. Plaintiff submitted his application in reasonable reliance on the job's Level 3 designation and its associated compensation.

15. Defendant subsequently extended an offer to Plaintiff for the Workplace Coach position. At no time prior to acceptance did Defendant inform Plaintiff that the position had been or would be downgraded in pay grade or classification.

16. Relying on the terms and classification presented in the original posting, Plaintiff accepted the offer and commenced employment in February 2023. Defendant was aware that Plaintiff relied on the original Level 3 designation in deciding to accept the promotion.

17. Upon acceptance, Plaintiff was presented with a compensation package that was approximately $15,000–$17,000 lower than the salary range associated with the Level 3 role.

It was only then that Plaintiff was informed that the role had been reclassified to a Level 2 position. Accordingly, Defendant knowingly withheld this material information during the hiring process.

18. Notwithstanding the alleged reclassification, Plaintiff immediately assumed and performed the full scope of duties as outlined in the original Level 3 job description. These duties included leading organizational projects, mentoring peers, delivering cross-functional training, and managing high-level communications and documentation with senior management—responsibilities exceeding those typically associated with a Level 2 role.

19. Weeks later, Defendant subsequently and retroactively altered the internal job posting to reflect the Level 2 classification and lower salary, effectively concealing the material change in terms and misrepresenting the nature of the role. This retroactive modification further deprived Plaintiff of the compensation and status he was led to believe he had earned.

20. Defendant's actions in altering the compensation and classification after Plaintiff accepted the role were not the result of an administrative error or misunderstanding, but rather an intentional act designed to induce Plaintiff into accepting the position under false pretenses.

21. After being assigned to the SKO project, Plaintiff raised concerns to Defendant's Human Resources Department regarding the inconsistency between what was initially promised for the role and what was offered. Following multiple meetings with Human Resources, Defendant adjusted Plaintiff's compensation to reflect the appropriate rate in February 2023, approximately one month later.

22. From February 2023 through October 2023, Plaintiff engaged in regular monthly one-on-one meetings with his direct supervisor, Mr. Ryan Cass (Caucasian Male), a senior manager for Defendant, to review his progress and performance. Notably, at no point during these

meetings was Plaintiff informed that his work performance was unsatisfactory or in need of improvement. Instead, the meetings focused on Plaintiff's personal life, background, and goals—information that was later weaponized against Plaintiff as a form of intimidation and harassment based on Plaintiff's race.

23. In March 2023, a member of the LSCC contacted Plaintiff about interviewing for a supervisor role. When Plaintiff discussed this opportunity with Mr. Cass, Mr. Cass refused to allow Plaintiff to apply, stating: "I'm not in the business of letting people jump from one organization to another organization." Even though this was an upward mobility opportunity, rather than a lateral transfer, Mr. Cass blocked Plaintiff from advancing. Around the same time, a non-African American colleague was allowed to accept a new position in less than eighteen (18) months, under nearly identical circumstances.

24. Starting in or around April 2023, Plaintiff experienced targeted racial harassment on a weekly and daily basis from Mr. Cass. Plaintiff was routinely micromanaged and singled out. Furthermore, Plaintiff's whereabouts were constantly monitored, colleagues were questioned about his location and activities, and every project or task Plaintiff worked on was heavily scrutinized. In addition, Plaintiff was deliberately pitted against his fellow team members, creating a divisive and racially hostile work environment. In contrast, similarly situated non-African American employees, including those who did not work their full shifts, were not subjected to the same level of surveillance, scrutiny, or internal competition.

25. Moreover, Plaintiff was also publicly undermined by Mr. Cass on a consistent basis, including frequently being interrupted and belittled while presenting to his peers. Such behavior was not directed toward any of his non-African American colleagues.

26. In or around November 2023, Plaintiff received his End-of-Year review from Defendant's newly appointed first-line manager, Mr. Daniel Rasmussen (Caucasian Male), who had only been in the role for approximately one month. In the review, Mr. Rasmussen stated that Plaintiff needed improvement in areas such as project communication and task tracking (CETs), despite Plaintiff's employment record showing no prior documented performance concerns. In response, Plaintiff proactively began submitting detailed daily wrap-up reports outlining his work, completed tasks, individuals assisted, and follow-up items.

27. Nevertheless, in February 2024, Plaintiff was placed on a Performance Improvement Plan (PIP) by Mr. Rasmussen and Mr. Cass. The PIP was issued without any prior formal counseling, progressive discipline, or documented evidence of underperformance prior to or following the November 2023 review.

28. The PIP significantly impacted Plaintiff's eligibility for a raise and performance-based bonus. Given the absence of prior documented performance issues and the surrounding context of disparate treatment, the PIP lacked objectivity, reflected Defendant's discriminatory bias, and was consistent with Defendant's broader pattern of unequal treatment toward Plaintiff.

29. Defendant released Plaintiff from the PIP early in or around March 2024, further displaying that Plaintiff had already met performance expectations. This early release highlights the unjustified nature of the PIP and supports the conclusion that the action was discriminatory.

30. Moreover, in March 2024, Plaintiff formally initiated Defendant's Alternative Dispute Resolution (ADR) process to challenge the unjustified PIP and ongoing discriminatory treatment. Despite taking this step toward resolution, Plaintiff endured a racially hostile work environment on a weekly basis from March through September 2024.

31. During this time, persistent hostility created a tense and oppressive atmosphere that adversely affected Plaintiff's well-being and ability to perform his duties. Plaintiff explicitly communicated his concerns and fears of retaliation to both the ADR representative and Defendant's Ethics Office, emphasizing that speaking out against discrimination exposed him to ongoing risk. These reports highlight the sustained nature of the discrimination and the racially hostile environment Plaintiff faced while seeking accountability.

32. In or around August 2024, after thoroughly reviewing Plaintiff's account of the ongoing issues, the ADR representative expressed concern that there may be more extensive or systemic problems occurring "behind the scenes." Plaintiff affirmed to the representative that he believed he was being subjected to discriminatory treatment. Recognizing the seriousness of the situation, the ADR representative filed an ethics claim on Plaintiff's behalf the same day, specifically citing concerns related to racial discrimination. This action underscored the representative's belief that Plaintiff's experience was part of a broader pattern of discriminatory conduct within Defendant's workplace.

33. Around the same time, Defendant's Workplace Coach, Mr. Mike Staziack (Caucasian Male), approached Plaintiff to acknowledge that he had personally observed Plaintiff being treated differently than non-African American employees by their shared supervisor, Mr. Cass. Mr. Staziack recognized this differential treatment as unfair and subsequently reported the mistreatment to upper management, including Mr. Rasmussen. These actions confirm that leadership within the Defendant's organization had actual or constructive knowledge of discriminatory conditions in the workplace.

34. In or around September 2024, the Defendant concluded its ethics investigation with no formal disciplinary action, instead advising that Plaintiff's supervisor receive 'coaching' on

leadership style. The investigation failed to adequately address or resolve Plaintiff's ongoing complaints regarding the racially hostile work environment. Moreover, Plaintiff's concerns about the unfair performance evaluation remained unremedied, leaving critical issues of discriminatory treatment and workplace hostility unresolved.

35. Following the investigation, Plaintiff was repeatedly referred back and forth between Defendant's Human Resources and Employee Relations Departments, with neither department accepting responsibility for addressing or resolving Plaintiff's ongoing concerns. This breakdown in internal resolution processes regarding Plaintiff's race-based concerns further delayed meaningful action and prolonged his experience of discriminatory treatment.

36. In November 2024, Defendant's Human Resources recommended that Plaintiff escalate his concerns by speaking directly with his supervisor's manager, Defendant's Director, Mr. Alan Terry (Caucasian Male). On November 12, 2024, Plaintiff met with Mr. Terry to reiterate that his complaints had not been adequately addressed. During the meeting, Mr. Terry expressed his support for the findings of the ethics review.

37. On November 13, 2024, at approximately 12:00 p.m., Plaintiff filed a complaint with the South Carolina Human Affairs Commission. Later that same day, around 3:00 p.m., Plaintiff was informed of his layoff. Present at the meeting were Mr. Rasmussen, Mr. Terry, and another Defendant employee.

38. The layoff occurred just hours after Plaintiff engaged in protected activity under Title VII by filing a formal discrimination complaint with the South Carolina Human Affairs Commission and during the ongoing ADR process initiated to address his concerns regarding racial discrimination and a racially hostile work environment. The timing and circumstances of the layoff raise concerns of retaliation in response to Plaintiff's efforts to report and challenge

discriminatory treatment, suggesting a causal connection between his protected activity and the adverse employment action.

39. At the time of the layoff, Plaintiff's Caucasian counterparts, who held comparable roles and qualifications, were given the opportunity to transition into other positions within the Defendant company as an alternative to termination. Plaintiff was not extended the same opportunity, despite being similarly situated. Moreover, Plaintiff was the only individual in the Workplace Coach role who was selected for layoff. This disparate treatment raises serious concerns of race-based discrimination and suggests a deviation from the Defendant's standard layoff practices and internal policies.

40. Mr. Terry confirmed that Plaintiff's supervisor—against whom Plaintiff had previously filed complaints of racial discrimination—was directly involved in the "down-select" layoff process. Given the prior complaints and the timing of the layoff, this involvement supports the conclusion that the decision was retaliatory in nature and influenced by racial bias.

41. Specifically, Plaintiff enjoyed sixteen (16) years of satisfactory performance with Defendant and was directly involved in the coaching and assessment of a Caucasian employee, Mr. Wallace "Brad" Hopkins, who worked in Plaintiff's department. Upon information and belief, Mr. Hopkins was underperforming and had received numerous counselings and warnings —issues that, under normal circumstances, should have warranted a layoff. However, to Plaintiff's surprise, Mr. Hopkins was retained. This action by Mr. Rasmussen and Mr. Terry left Plaintiff with no other conclusion that he was deliberately targeted for layoff based upon the retaliatory animus toward him and his status as an African American.

42. In November 2024, Ms. Savannah Ford (African American Female), then employed as a Second-Level Manager for Defendant, confided in Plaintiff that she believed Plaintiff was

being intentionally blackballed within Defendant company. Ms. Ford disclosed that Plaintiff's Caucasian manager, Mr. Owens, had informed her that Plaintiff was terminated for "stealing time"—a baseless and defamatory accusation that Plaintiff had never been investigated for, reprimanded for, or even notified of. This revelation not only confirmed Plaintiff's growing concerns about retaliation but also exposed the circulation of false narratives that were damaging his professional reputation and limiting future employment opportunities. The fact that such serious and unfounded accusations were spread internally, without due process, further reflects the racially hostile and retaliatory environment in which Plaintiff was forced to work.

43. Following the layoff, Plaintiff contacted Mr. Rasmussen to inquire about the status of the pending ADR process but was informed that Defendant would not reconsider or reverse the layoff. During an ADR call on December 10, 2024, with Mr. Rasmussen and Defendant's Human Resources representative, Ms. Shelby Long (African American Female), who attempted to mediate the matter, Mr. Rasmussen contended that Plaintiff was "still underperforming." In support of this claim, Mr. Rasmussen cited a single missed assignment, which resulted from Plaintiff being out sick due to a family illness, as justification for what he characterized as two years of purported poor performance.

44. Mr. Rasmussen further claimed that Plaintiff's former manager, Ms. Chapman, had reported that Plaintiff underperformed while in her department. However, this assertion contradicted Ms. Chapman's earlier actions, as she had previously endorsed and supported Plaintiff's application for promotion to the Workplace Coach position. Furthermore, it also contradicted Mr. Rasmussen's and Mr. Cass's recommendations made shortly before the layoff, including

allowing Plaintiff to represent the Workplace Coach role before Defendant's Charleston location Head, as well as other actions inconsistent with claims of underperformance.

45. From December 2024 to the present, Plaintiff's ADR appeal has remained unresolved. Despite Plaintiff's repeated efforts to follow Defendant's internal grievance procedures, including engagement with Human Resources, Ethics, and upper management, Defendant failed to take meaningful steps to investigate or address the issues.

46. Plaintiff's core concerns, including ongoing race-based treatment, retaliation for protected activity, and a racially hostile work environment, were repeatedly deferred, minimized, or dismissed. Defendant has continued to deny any wrongdoing and has failed to take appropriate action to address Plaintiff's legitimate and well-documented complaints.

47. In doing so, Defendant failed to adhere to the express and implied contractual obligations set forth in its employment policies, internal grievance procedures, and representations made to Plaintiff regarding fair treatment and non-retaliation. Despite Plaintiff's good faith participation in Defendant's processes, including ADR, Ethics, and Human Resources, his concerns were not meaningfully addressed.

48. Furthermore, Plaintiff reasonably relied on Defendant's representations that his concerns would be addressed through Defendant's internal procedures such as ADR, Ethics, and Human Resources. However, those representations were made with no genuine intent to provide a fair or impartial resolution, as evidenced by Defendant's failure to act, shifting of responsibility between departments, and ongoing retaliation.

49. As a result of the foregoing, Plaintiff asserts claims for Race Discrimination, Retaliation, and the maintenance of a Racially Hostile Work Environment under 42 U.S.C. § 1981, as amended, as well as state law claims for Breach of Contract and Breach of Contract

Accompanied by Fraudulent Intent. Under these claims, Plaintiff is entitled to all available legal and equitable relief, including but not limited to back pay, front pay, compensatory damages, punitive damages, consequential damages, and any other relief deemed just and proper.

## FIRST CAUSE OF ACTION

### *RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981*

**(Against Defendant The Boeing Company)**

50. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

51. Plaintiff is African American and belongs to a protected racial class under 42 U.S.C. § 1981.

52. Defendant is an employer within the meaning of § 1981 and employed Plaintiff for approximately sixteen (16) years.

53. Plaintiff was qualified for his position and consistently performed his job duties in a satisfactory or exemplary manner, as demonstrated by performance-based recognition, certifications, promotions, and positive peer and leadership feedback.

54. Defendant subjected Plaintiff to adverse and unequal treatment on the basis of his race, including but not limited to:

  a. Offering Plaintiff significantly lower compensation than advertised for a Level 3 Workplace Coach position and retroactively altering the job classification after Plaintiff accepted the promotion;

  b. Targeting Plaintiff for daily and weekly harassment by his supervisor, including micromanagement, excessive scrutiny, and heightened oversight of his whereabouts, work product, and activities;

c.  Singling Plaintiff out by questioning coworkers about his location, while similarly situated non-African American employees were not subjected to such monitoring or scrutiny;

d.  Publicly undermining Plaintiff through frequent interruptions and belittling during presentations—conduct not directed at non-African American colleagues;

e.  Deliberately pitting Plaintiff against his team members, fostering a divisive and racially charged work environment;

f.  Blocking Plaintiff from advancement opportunities while allowing non-African American colleagues with similar or lesser qualifications to progress;

g.  Placing Plaintiff on a Performance Improvement Plan (PIP) without prior counseling, progressive discipline, or documented performance issues;

h.  Terminating Plaintiff shortly after he engaged in protected activity, while retaining non-African American employees to include those with documented performance concerns;

i.  Denying Plaintiff the opportunity to be repositioned within the company following the layoff, despite allowing similarly situated non-African American employees to transition into other roles; and

j.  Circulating false and defamatory claims—such as an unsubstantiated accusation of "stealing time"—following Plaintiff's termination, damaging his reputation.

55. These actions occurred under circumstances giving rise to a reasonable inference of racial discrimination, as similarly situated non-African American employees were not subjected to comparable treatment.

56. Defendant's conduct constitutes unlawful race discrimination in violation of 42 U.S.C. § 1981.

57. As a direct and proximate result of Defendant's discriminatory actions, Plaintiff has suffered damages including lost wages, lost benefits, reputational harm, emotional distress, and other economic and non-economic losses.

## SECOND CAUSE OF ACTION
### *RACIALLY HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981*
### (Against Defendant The Boeing Company)

58. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

59. Plaintiff is African American and belongs to a protected racial class under 42 U.S.C. § 1981.

60. Defendant subjected Plaintiff to a racially hostile work environment in violation of § 1981 by allowing and perpetuating racially discriminatory conduct, comments, and treatment throughout his employment.

61. Beginning in or around March 2023 and continuing until his termination in November 2024, Plaintiff was subjected to ongoing, pervasive, and unwelcome conduct based on his race by supervisory personnel and other employees acting on Defendant's behalf.

62. The racially charged conduct included, but was not limited to:

   a. Caucasian colleagues characterizing Plaintiff as "intimidating" solely due to his physical appearance—a perception reflecting harmful racial stereotypes and implicit bias;

   b. Plaintiff being explicitly instructed to lower his chair during meetings and to avoid making eye contact with others in order to appear "less threatening," further reinforcing racially biased assumptions about his demeanor;

c.  Constant micromanagement, excessive scrutiny of tasks and location, and being singled out for oversight not applied to similarly situated non-African American employees;

d.  Public belittling and interruptions during meetings and presentations, intended to discredit Plaintiff professionally, diminish his authority, and humiliate him in the presence of his peers;

e.  Being pitted against team members by management, fostering internal division and undermining his professional relationships;

f.  Being falsely accused of misconduct, following his termination, despite never having been informed of such accusations or subjected to any related investigation or discipline during his employment;

g.  Experiencing deliberate exclusion and manipulative treatment while seeking redress through Defendant's internal channels; and

h.  Being advised by both coworkers and internal personnel that the differential treatment he experienced was racially motivated and part of a broader pattern of exclusion of African American employees.

63. The harassment and differential treatment described above were severe and pervasive enough to alter the terms and conditions of Plaintiff's employment and to create a work environment that a reasonable person would find hostile and abusive.

64. Plaintiff subjectively believed the work environment was hostile and intimidating, and he reported his concerns to Human Resources, Ethics, ADR representatives, and upper management. Despite this, no meaningful corrective action was taken.

65. Defendant failed to take prompt or effective remedial measures to stop the racially hostile behavior and instead allowed it to continue, thereby compounding the harm to Plaintiff.

66. As a direct and proximate result of the racially hostile work environment, Plaintiff suffered emotional distress, humiliation, reputational harm, loss of income, and other economic and non-economic damages.

## **THIRD CAUSE OF ACTION**
### *RETALIATION IN VIOLATION OF 42 U.S.C. § 1981*
**(Against Defendant The Boeing Company)**

67. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

68. Plaintiff engaged in protected activity under 42 U.S.C. § 1981, including but not limited to:

   a. Raising concerns about unequal pay, disparate treatment, and discrimination;

   b. Filing an internal complaint through Defendant's Alternative Dispute Resolution (ADR) program;

   c. Filing an Ethics complaint alleging race-based discrimination;

   d. Filing a formal charge of discrimination with the South Carolina Human Affairs Commission; and

   e. Voicing concerns about retaliation and racially hostile treatment.

69. Defendant had knowledge of Plaintiff's protected activity.

70. In direct response to Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions, including but not limited to:

   a. Increased scrutiny and surveillance beyond what was applied to similarly situated employees;

b. Placement on an unjustified Performance Improvement Plan (PIP) that negatively impacted Plaintiff's pay and promotion eligibility;

c. Failing to address or investigate Plaintiff's complaints in good faith;

d. Allowing the supervisor named in Plaintiff's complaints to participate in the decision to terminate Plaintiff's employment;

e. Terminating Plaintiff's employment within hours of Plaintiff's filing of his formal race discrimination complaint with the South Carolina Human Affairs Commission;

f. Circulating false and reputationally damaging claims about Plaintiff; and

g. Denying Plaintiff the opportunity to be repositioned within the company in lieu of layoff, despite offering such alternatives to similarly situated non-African American employees.

71. The timing and circumstances of these actions give rise to an inference that Defendant's conduct was retaliatory.

72. Defendant's retaliatory actions were taken in bad faith to punish Plaintiff for engaging in protected activity by asserting his civil rights under § 1981.

73. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to lost wages and benefits, emotional distress, reputational harm, and other compensatory and consequential damages.

## FOURTH CAUSE OF ACTION
### *BREACH OF CONTRACT*
**(Against Defendant The Boeing Company)**

74. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

75. At all relevant times, a valid and enforceable contractual relationship existed between Plaintiff and Defendant, arising from a combination of written agreements, internal policies, and representations made to Plaintiff throughout his employment. These included, but were not limited to:

    a. Plaintiff's offer letters and acceptance of employment into successive roles with increasing responsibility;

    b. Official job postings, HR communications, and pay classifications associated with each of Plaintiff's roles throughout his employment;

    c. Company policies and procedures governing performance management, promotions, layoffs, internal grievances, and workplace conduct;

    d. Defendant's Code of Conduct and Ethical Business Conduct Guidelines, which promised non-discriminatory treatment, non-harassment, transparency, non-retaliation, and equal opportunity in advancement; and

    e. Representations that concerns raised through Human Resources, the Ethics Office, and ADR would be reviewed in good faith and resolved through fair internal processes.

76. Plaintiff fully performed his duties under the contract throughout his sixteen-year tenure, including meeting or exceeding performance expectations, completing job-specific training, maintaining certifications, and accepting promotions based on Defendant's stated expectations and representations.

77. Defendant materially breached the terms of this contractual relationship by:

    a. Failing to compensate Plaintiff in accordance with the originally posted Level 3 Workplace Coach position, despite knowingly allowing him to accept the role based on that representation;

    b. Retroactively altering the Workplace Coach job classification and salary range after Plaintiff accepted the position, without notice or consent;

    c. Subjecting Plaintiff to an unjustified and procedurally improper Performance Improvement Plan (PIP) that lacked a basis in prior evaluations or documented concerns;

    d. Failing to follow its own stated layoff protocols by allowing a supervisor implicated in discrimination complaints to participate in the layoff decision;

    e. Refusing to consider Plaintiff for reassignment or repositioning within the company, despite offering such options to similarly situated non-African American employees;

    f. Failing to meaningfully process Plaintiff's grievances under internal Ethics, HR, and ADR systems, in violation of Defendant's written procedures and commitments; and

    g. Violating the express terms and spirit of its Code of Conduct and Ethical Business Conduct Guidelines, including policies ensuring fair treatment, ethical leadership, and non-retaliation for employees who raise concerns.

78. Defendant's conduct reflects not only a breach of contract, but also a breach of the duty of good faith and fair dealing, which governed the employment relationship and the operation of internal systems on which Plaintiff reasonably relied.

79. As a direct and proximate result of Defendant's breaches, Plaintiff suffered loss of income, reputational harm, emotional distress, and other actual and consequential damages.

## FIFTH CAUSE OF ACTION
### *BREACH OF CONTRACT ACCOMPANIED BY FRAUDULENT INTENT*
### (Against Defendant The Boeing Company)

80. Plaintiff reiterates each and every allegation contained in the preceding paragraphs as if set forth verbatim herein.

81. At all relevant times, Defendant, through its agents, managers, and human resources representatives, entered into binding and enforceable contractual obligations with Plaintiff.

82. From the beginning of his employment in 2009, through his promotion to LSCC in 2022 and his acceptance of the Workplace Coach position in 2023, and continuing until his termination, Plaintiff justifiably relied upon Defendant's written policies and oral representations, including but not limited to its Code of Conduct and Ethical Business Conduct Guidelines. These representations created express and implied contractual obligations, including promises of fair treatment, honest communication, advancement based on merit, and good-faith resolution of concerns—free from discrimination, retaliation, and deception.

83. Defendant materially breached these obligations and did so with fraudulent intent by knowingly misrepresenting or concealing material facts, including:

    a. Advertising and offering the Workplace Coach role as a Level 3 position with corresponding compensation, then covertly reclassifying it to Level 2 while continuing to assign Level 3 duties;

    b. Failing to disclose the reclassification and lower salary prior to Plaintiff's acceptance, and later retroactively altering the job posting to conceal the change;

    c. Repeatedly assuring Plaintiff during one-on-one meetings that his performance met expectations, while underhandedly compiling a false record of underperformance to justify a pretextual PIP and termination;

    d. Misrepresenting the basis for Plaintiff's layoff as a neutral business decision, despite involving individuals named in Plaintiff's formal discrimination complaints, and executing the layoff within hours of Plaintiff's protected activity;

    e. Permitting defamatory rumors to circulate internally, without investigation, warning, or any factual basis.

84. These actions were not isolated or accidental. Rather, they reflected a pattern of deception and retaliation that directly violated Defendant's Code of Conduct, Ethical Business Conduct Guidelines, and related internal policies on non-discriminatory treatment, non-retaliation, non-harassment, and performance management—standards Defendant held out as governing principles and that Plaintiff reasonably relied on throughout his employment.

85. At the time Defendant made these representations and omissions, it had no intent to honor its promises or act in good faith. Defendant's conduct was designed to induce Plaintiff's continued reliance and employment to Defendant's benefit.

86. As a direct and proximate result of Defendant's fraudulent breach of contract, Plaintiff has suffered and continues to suffer substantial financial loss, reputational harm, and emotional distress.

## **JURY TRIAL REQUESTED**

87. Plaintiff requests a jury trial.

## **PRAYER FOR RELIEF**

88. **WHEREFORE**, Plaintiff prays that this Honorable Court declares that the Defendant The

Boeing Company's actions complained of herein violated the rights guaranteed to Plaintiff and issue its judgment:

a. Declaring the actions complained of herein illegal;

b. In favor of Plaintiff and against the Defendant for all causes of action herein alleged in an amount which is fair, just, and reasonable, and for actual, compensatory, special, and punitive damages;

c. Issuing an injunction enjoining Defendant, its Agents, Employees, Successors, Attorneys and those acting in concert or participation with Defendant, and at Defendant's direction from engaging in the unlawful practices set forth herein and any other employment practices shown to be in violation of 42 U.S.C. Section 1981 (Race Discrimination/ Racially Hostile Work Environment/ Retaliation), Breach of Contract and Breach of Contract Accompanied with Fraudulent Intent and the common laws of the State of South Carolina;

d. Awarding Plaintiff actual and compensatory damages for each Cause of Action contained herein as appropriate, which the jury should find appropriate as a result of Defendant's unlawful discriminatory actions taken based on Plaintiff's race and other pled causes of action, including: physical and mental anguish, pain and suffering, harm to Plaintiff's economic opportunities (present and future), any back pay, front pay and future earnings with cost of living adjustments, prejudgment interest, fringe benefits and retirement benefits;

e. Awarding Plaintiff his costs and expenses in this action, including reasonable Attorney's fees, and other litigation expenses; and

f.   Granting such other and further relief as the Court deems just and proper to afford

complete relief to Plaintiff.

Respectfully Submitted,


    s/Donald Gist
Donald Gist, Fed ID 7178
**GIST LAW FIRM, P.A.**
4400 North Main Street
Columbia, South Carolina 29203
Tel. (803) 771-8007
Fax (803) 771-0063
Email: dtommygist@yahoo.com

**Attorney for Plaintiff**


October 30, 2025